**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| CLIVE V. COOPER, individually and as | : | |
| a representative of a class of similarly situated | : | CIVIL ACTION NO. |
| plan participants, on behalf of the | : | |
| DST SYSTEMS, INC. 401(K) PROFIT | : | |
| SHARING PLAN, | : | |
| | : | CLASS ACTION COMPLAINT |
| Plaintiff, | : | |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| RUANE CUNNIFF & GOLDFARB INC., | : | |
| DST SYSTEMS, INC., THE ADVISORY | : | |
| COMMITTEE OF THE DST SYSTEMS, INC. | : | |
| 401(K) PROFIT SHARING PLAN, THE | : | |
| COMPENSATION COMMITTEE OF THE | : | |
| BOARD OF DIRECTORS OF DST SYSTEMS, | : | |
| INC., JEROME H. BAILEY, LYNN DORSEY | : | |
| BLEIL, LOWELL L. BRYAN, GARY D. FORSEE,: | | |
| GREGG WM. GIVENS, CHARLES E. | : | |
| HALDEMAN, JR., SAMUEL G. LISS, AND | : | |
| JOHN DOES 1-20, | : | |
| | : | |
| Defendants. | : | |

## I.   INTRODUCTION

1.      Plaintiff, Clive V. Cooper ("Plaintiff"), individually and as a representative of a

class of participants and beneficiaries (collectively, "participants" or the "Class") of the DST

Systems, Inc. 401(k) Profit Sharing Plan (the "DST Plan" or the "Plan"), brings this action under

29 U.S.C. §1132 on behalf of the Plan against Defendants, Ruane Cunniff & Goldfarb Inc., DST

Systems, Inc., the Advisory Committee of the DST Systems, Inc. 401(k) Profit Sharing Plan,

Gregg Wm. Givens, the Compensation Committee of the Board of Directors of DST Systems,

Inc., Jerome H. Bailey, Lynn Dorsey Bleil, Lowell L. Bryan, Gary D. Forsee, Charles E.

Haldeman, Jr., Samuel G. Liss,  and John Does 1-20 (collectively, "Defendants"), for breach of fiduciary duties and other violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*.

2.     Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k)(*i.e.,* 401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner in which participants bear the risk of high fees and investment under-performance.

3.     Personal savings accounts in the form of 401(k) and other defined contribution plans have become the primary method for employees in the United States to save for retirement in recent years.  The importance of defined contribution plans to the United States retirement system has become increasingly pronounced as employer-provided defined benefit ("DB") plans have become increasingly rare as an offered and meaningful employee benefit.

4.     With more than $1 billion in assets, the Plan is in the top one percent (1%) of 401(k) plans in the country in terms of assets.  The marketplace for 401(k) retirement plan services is well established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.  Billion dollar defined contribution plans, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of

401(k) plans and the investment of 401(k) assets.  As fiduciaries to the Plan, Defendants are

obligated to act for the exclusive benefit of participants, invest the assets of the Plan in a prudent

fashion and ensure that Plan expenses are fair and reasonable.  At all pertinent times, as

explained below, Defendants (a) were fiduciaries under ERISA, and (b) breached their fiduciary

duties under ERISA in a myriad of significant ways, to the extreme detriment of the Plan and its

participants.

5.       As explained more fully below, Defendants pursued an exceptionally imprudent

investment strategy with respect to a significant portion of the Plan's assets (which they invested

without any input or oversight by participants in the Plan) and/or failed to adequately monitor the

investments of the Plan and the fiduciaries pursuing this investment "strategy."  As a direct result

and consequence of these imprudent investment decisions and related misconduct, the Plan and

its participants have suffered losses of well in excess of $100 million.

6.       Defendants also breached their fiduciary duties by allowing unreasonable

expenses to be charged to participants for administration of the Plan, and selected and retained

high-cost and poor-performing investments instead of other available and more prudent

alternative investments.  As explained below, these breaches of fiduciary occurred, at least in

part, as a result of severe conflicts of interest between and among the fiduciaries of the DST Plan

that resulted in repeated prohibited transactions and acts of self-dealing, in violation of Section

406 of ERISA, 29 U.S.C. § 1106.  As a direct result and consequence of these breaches of

fiduciary duty and related misconduct, the Plan and its participants have suffered losses of tens of

millions of dollars.

7.      To remedy these fiduciary breaches and other violations of ERISA, Plaintiff, individually and as a representative of a class of participants in the Plan, brings this action on behalf of the Plan under Section 502, 29 U.S.C. §1132, and Section 409 of ERISA, 29 U.S.C. §1109, to recover and obtain all losses resulting from each breach of fiduciary duty, prohibited transaction and other violation of ERISA, to restore to the Plan any profits made through Defendants' use of the Plan's assets and for disgorgement with respect to all fees and compensation received by any of the Defendants in connection with any prohibited transaction. In addition, Plaintiff seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate and just under all of the circumstances.

8.      Plaintiff specifically brings this action on behalf of the participants of the Plan under ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, to recover the following relief:

- A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

- A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the participants;

- Disgorgement and/or restitution of all payments and other compensation improperly received by Defendants, or, alternatively, the profits earned by Defendants in connection with their receipt of such unlawful payments and other unlawful compensation;

- Compensatory damages;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

-4-

## II.   THE PARTIES

9.      Plaintiff is a current participant under 29 U.S.C. §1002(7) of the DST Plan, which

is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C.

§1002(2)(A) and §1002(34).  Plaintiff is a resident of El Dorado Hills, El Dorado County,

California.  The Plan is established and maintained under a written document in accordance with

29 U.S.C. §1102, and serves as a vehicle for retirement savings and to produce retirement income

for employees of DST Systems, Inc. and certain of its subsidiaries and affiliates, including ALPS

Advisors, Inc., ALPS Fund Services, Inc., Argus Health Systems, Inc., Converge Systems, LLC,

DST Brokerage Solutions, LLC, DST Direct, LLC, DST Global Solutions NA, LLC, DST Health

Solutions, LLC, DST Mailing Services, Inc., DST Market Services, LLC, DST Output, LLC,

DST Output Central, LLC, DST Output East, LLC, DST Output West, LLC, DST Output

Electronic Solutions, Inc., DST Systems of California, LLC, DST Realty, Inc., DST Realty of

California, Inc., DST Retirement Solutions, LLC, DST Technologies, Inc., DST Worldwide

Services, LLC, Finix Professional Services, LLC, Lateral Group NA, LLC, LTM Publishing,

Inc., MC Realty Group, LLC, McKay Hochman Co., Inc., National Financial Data Services, Inc.

d/b/a BFDS Midwest, Newkirk Products, Inc., ThirdParty Educational Systems, Inc. (the "DST

Affiliates").  DST Systems, Inc. ("DST Systems") is hereafter referred to individually and/or

collectively with the DST Affiliates, as may be applicable, as "DST" or the "Company."

Retirement income generated by the Plan depends upon contributions made on behalf of each

employee by the Company, deferrals of employee compensation and employer matching

contributions, and from the performance of investment options (net of fees and expenses)

exclusively controlled by the fiduciaries of the Plan.  DST established a trust (the "Trust") to hold participant and employer contributions and such other earnings, income and appreciation from Plan investments, less payments made by the Plan's trustee to carry out the purposes of the Trust, in accordance with 29 U.S.C. §1103.  As of December 31, 2014, the Plan was one of the country's largest 401(k) plans, with more than $1.4 billion in total assets and over 9,400 participants with account balances.

10.     Defendant, Ruane Cunniff & Goldfarb, Inc. ("RCG" or "Ruane"), is a Delaware corporation and registered investment adviser with its principal place of business in New York, New York.  RCG is an investment firm that serves as an investment adviser and fiduciary to the Plan pursuant to 29 U.S.C. § 1002.  RCG's flagship fund, the Sequoia Fund, contains more than $25 billion in assets.

11.     Defendant, DST Systems, is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Kansas City, Jackson County, Missouri.  DST Systems is the plan sponsor and plan administrator, a designated fiduciary of the Plan and a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002, 1102.

12.     Defendant, the Advisory Committee of the DST Systems, Inc. 401(k) Profit Sharing Plan (the "Advisory Committee"), is a named fiduciary under the Plan and under ERISA pursuant to 29 U.S.C. §§ 1002, 1102.  The Advisory Committee maintains its address at the headquarters of DST Systems in Kansas City, Jackson County, Missouri.

13.     Defendant, Gregg Wm. Givens ("Givens"), is a member of the Advisory Committee who also serves as DST's Senior Vice President, Chief Financial Officer &

Treasurer.  Givens is a fiduciary to the Plan who maintains his principal business address in Kansas City. Jackson County, Missouri and his place of residence in Kansas City, Platte County, Missouri.

14.     Upon information and belief, Defendant, the Compensation Committee of the Board of Directors of DST ("Compensation Committee"), has the sole authority to appoint and remove members of the Advisory Committee, amend or terminate, in whole or part, the Plan or the Trust, is a named fiduciary under the Plan and under ERISA pursuant to 29 U.S.C. §§ 1002, 1102.  The Compensation Committee maintains its address at the headquarters of DST Systems in Kansas City, Jackson County, Missouri.

15.     Defendant, Jerome H. Bailey ("Bailey"), is a a Director of DST, a member of the Compensation Committee and, by virtue of that membership, a fiduciary of the Plan.  Bailey is currently a resident of Cortez, Manatee County, Florida.

16.     Defendant, Lynn Dorsey Bleil ("Bleil"), is a a Director of DST, a member of the Compensation Committee and, by virtue of that membership, a fiduciary of the Plan.  Bleil is currently a resident of Park City, Summit County, Utah.

17.     Defendant, Lowell L. Bryan ("Bryan"), is a a Director of DST, a member of the Compensation Committee and, by virtue of that membership, a fiduciary of the Plan.  Bryan is currently a resident of Key Largo, Monroe County, Florida.

18.     Defendant, Gary D. Forsee ("Forsee"), is a a Director of DST, a member of the Compensation Committee and, by virtue of that membership, a fiduciary of the Plan.  Forsee is currently a resident of Columbia, Boone County, Missouri.

19.     Defendant, Charles E. Haldeman, Jr. ("Haldeman"), is a Director of DST, a member of the Compensation Committee and, by virtue of that membership, a fiduciary of the Plan.  Haldeman is currently a resident of Haverford, Montgomery County, Pennsylvania.

20.     Defendant, Samuel G. Liss ("Liss"), is a a Director of DST, a member of the Compensation Committee and, by virtue of that membership, a fiduciary of the Plan.  Liss is currently a resident of Mill Neck, Nassau County, New York.

21.     Defendants, Bailey, Bleil, Bryan, Forsee, Haldeman and Liss are referred to herein collectively as the "Compensation Committee" or the "Compensation Committee Defendants."

22.     DST has the ultimate discretionary authority or control regarding management of the Plan or management or disposition of the Plan's assets, and administered the Plan through the Compensation Committee and officers and employees of DST, including members of the Advisory Committee.

23.     Plaintiff is currently unaware of the identities of all of the individual members of the Advisory Committee (with the exception of Givens), who are collectively referred to herein as the "Advisory Committee" or the "Advisory Committee Defendants."  Those individuals are collectively named as John Does 1-20.  Plaintiff will substitute the real names of the John Does when Plaintiff obtains the names of these individuals.

### III.   JURISDICTION AND VENUE

24.     Plaintiff seeks relief on behalf of the participants of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132.

25.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and

ERISA Section 502(e), 29 U.S.C. § 1132(e).

26.     Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29

U.S.C. § 1132(e) and 28 U.S.C. § 1391, because RCG maintains its headquarters and principal

place of business in New York, New York.  At all pertinent times, RCG has conducted its

investment advisory business and provided services to the Plan from its offices in this judicial

district in New York, New York, which offices function as the nerve center for the operations of

RCG.  The PSA (defined below) is administered in New York, New York by RCG, which also

provides additional investment advisory services to the Plan forming the substantial bases for this

action from New York, New York.  In addition, the majority of the acts and omissions giving rise

to this action and the losses suffered by the Plan arose and were directed from this judicial

district.

## IV.     BACKGROUND FACTS

### A.     The Composition Of The DST Plan

27.     The DST Plan consists of two components: a 401(k) portion which is

participant-directed and a Profit Sharing Account ("PSA"), in which the assets are invested by

the Trustee of the Plan, as advised by an investment advisory firm (*i.e.*, RCG) selected and

monitored by the Advisory Committee, *i.e.*, the assets are not participant-directed.  As discussed

below, until recently (December 31, 2014), the DST Plan also included an investment option that

permitted participants to invest in DST stock (the "Company Stock Fund").

28.     This arrangement in which the PSA is not participant-directed is extremely

-9-

unusual (since PSA assets almost always are participant directed), and results in the entire Plan or, at a minimum, that PSA portion of the Plan losing the protection of Section 404(c) of ERISA.

**B.**     **The PSA Portion Of The DST Plan**

29.     Defendants have structured the PSA to provide a projected level of benefits through contributions by the Company invested in a manner that Defendants have determined will achieve a desirable, aggressive, long-term rate of return -- in essence, an investment strategy akin to that of a DB plan -- without the obligation for the Company to make any contributions in the event of an investment return short-fall or provide any guaranteed benefit.  As detailed below, the assets of the PSA have been invested in a reckless and imprudent manner to the severe detriment of the Plan and its participants, who have suffered losses in excess of $100 million as a result of Defendants' breaches of duty.  In sum, with respect to the retirement savings of Plan participants, Defendants have been gambling with these Plan assets by failing to appropriately diversify them and pursuing risky, inappropriate investment strategies, without providing participants with any meaningful and timely guidance regarding the nature of the investments held in the PSA or any specific or meaningful and timely information regarding the investment objectives or investment components of the PSA.

30.     With respect to the PSA portion of the Plan, the Company and the other Defendants have specifically been gambling approximately 50% of the Plan's employee retirement assets in an opaque, high-cost, high-risk, long-term investment strategy.  While the Plan purports to be designed to obtain the protections of Section 404(c) of ERISA and, under Section 404(c), plan fiduciaries may be relieved of liability for poor investment decisions made

by Plan participants, at a minimum, the investments in the PSA do not qualify for Section 404(c) protection because Defendants directly or indirectly control these investments with absolutely no participant input or control.  Moreover, since Defendants forcibly allocate approximately 50% of the Plan's assets into an opaque, high-cost, high-risk investment vehicle (*i.e.,* the PSA), the Plan's entire investment menu is tainted and none of the investments in the Plan qualify for Section 404(c) protection because Defendants have effectively eliminated the opportunity for participants to diversify their retirements savings and investments.

31.    Participants in the Plan were prevented from receiving meaningful information regarding the investment objectives of the PSA.  Participants did not receive regular updates or meaningful information regarding the investment objectives of or the securities or other investments contained in the PSA.  Instead, participants in the Plan simply received periodic, post-hoc reports regarding the performance of the PSA that provided generalized information regarding the return (or lack thereof) achieved in connection with the investment of the PSA.  Although Defendants have provided an ability for participants to obtain additional information regarding the retrospective performance of the PSA, participants literally have no means to monitor the current investments contained in the PSA in order to otherwise diversify their retirement investments based upon the current and existing investments in the PSA -- about which participants literally receive no meaningful information.

32.    The limited information provided by Defendants regarding the investment objectives of the PSA borders on the absurd.  Specifically, the information provided by Defendants regarding the PSA's investment objectives simply states that the PSA has an

investment objective "to achieve positive growth over the long term." This obviously is an extremely broad and vague investment objective. Presumably, all investment funds, including retirement investment funds, seek to achieve "positive growth over the long term." There are no asset class limitations or other restrictions or guidelines contained in the description of the investment objectives of the PSA provided to participants. Instead, participants are provided with the essentially meaningless information that the PSA seeks to achieve positive growth over the long term, which characterizes virtually every retirement investment of any kind. Ironically, with respect to the non-PSA portion of the Plan (discussed below), Defendants have advised participants that they should not invest in any of the investments chosen by the Advisory Committee as available investments (*i.e.*, the mutual funds discussed below) without first carefully reading the prospectus associated with the investment. But, in the case of the PSA, Defendants have caused approximately 50% of participants' assets to be invested in a vehicle (*i.e.*, the PSA) about which participants cannot obtain any timely or meaningful information. Thus, as a result of Defendants' breaches of fiduciary duty, participants were and are effectively prevented from obtaining any information regarding the current investments or holdings of the PSA.

33.     Even if Defendants had fully disclosed to participants the investment objectives, strategies and portfolio holdings of the PSA (which, as discussed above and below, they did not), participants could not properly diversify their retirement investments by simply eliminating risks related to the PSA by diversifying the other 50% of their retirement assets. That is because the PSA constituted such a significant portion of the Plan's investments and assets that participants

-12-

did not have a meaningful opportunity or means to properly diversify their retirement investments in the Plan, given the dominance of the PSA within the Plan.  As detailed below, the Trustee of the Plan specifically advises participants to avoid over-concentration by investing retirement assets in one industry or security with more than 20% of their retirement assets contained in the non-PSA portion of the Plan (discussed below).  Amazingly, as discussed below, Defendants and RCG utterly failed to heed this same advice and, as a result, lost over $100 million in Plan assets by failing to adequately diversify the PSA.

34.    At all pertinent times, there was absolutely no transparency with respect to the investments in the PSA or the risk level that the Advisory Committee authorized RCG to pursue in connection with the investments in the PSA.  When participants inquired as to the investment strategy of the PSA and/or the nature of the investments held in the PSA, the Company responded that participants should not worry because "the Company invests this for you."

**C.    RCG's Investment Management Of The PSA
And The Relationship Between RCG And DST**

35.    DST has a significant financial services/investment advisory business itself -- with the Company's financial services/investment advisory business contributing almost 50% of the Company's revenues.  It appears that many of the investment managers retained by DST to manage 401(k) assets have business relationships with DST.  Moreover, the sole investment manager selected by the Advisory Committee to manage the PSA, RCG, has had a relationship with the Company that "goes back decades-to the 1980s," as the Company recently disclosed in a communication to participants.

36.    The Plan's Summary Plan Description ("SPD") advises participants that "[a]ll

Profit Sharing Contributions made by the Employer to the Plan on your behalf will be invested by the Trustee as advised by Ruane, Cunniff & Goldfarb, Inc., the investment adviser selected by the Advisory Committee to manage these funds" and "[y]ou may not direct the investment of these funds into other investment alternatives."

37.     RCG is a storied investment advisory firm which has managed the highly successful Sequoia Fund Inc. (the "Sequoia Fund") for decades.  RCG and Berkshire Hathaway's Warren Buffett had a longstanding personal relationship -- Buffett referred clients to RCG's Sequoia Fund when he closed his investment partnership in 1969 and the mutual fund, since first buying Berkshire Hathaway stock about 20 years ago, has made it a major holding.

38.     At one point, Berkshire Hathaway holdings accounted for nearly 40% of the Sequoia Fund portfolio.  Indeed, it appears that the Sequoia Fund's historical returns were due to its Berkshire Hathaway holdings and, once the fund began reducing Berkshire Hathaway holdings, it has underperformed the S&P 500.  At this time, Berkshire Hathaway Class A is the second largest holding in the Sequoia Fund and Berkshire Hathway Class B is the Sequoia Fund's 5th largest holding, for a total of 11% of assets under management.

39.     Critics have observed that two of the founders of RCG are no longer living; performance has suffered in recent years and the reputation the firm has enjoyed for so many years is no longer deserved.  These are all factors which the Advisory Committee should have considered in deciding whether to continue to retain the firm as the Company's PSA investment manager.

40.     DST serves as the registrar and shareholder servicing agent for the Sequoia Fund.

-14-

DST provides investor recordkeeping, performance communications and other information to shareholders of the Sequoia Fund and has other administrative responsibilities with respect to the Sequoia Fund.  Ironically, while the Sequoia Fund is fully transparent to investors due, in part, to DST handling shareholder communications, the PSA (which, upon information and belief, "mirrors" the Sequoia Fund in a separate account) is highly opaque.

41.     DST, as an ERISA fiduciary, has failed to provide participants with meaningful and timely information about the PSA, which DST possesses and routinely provides to Sequoia Fund shareholders as the shareholder servicing agent of the mutual fund.  Given the longstanding financial relationship between the Company and the Sequoia Fund, the selection of RCG to manage the PSA raises significant self-dealing concerns under ERISA.  Both the Company and RCG are ERISA fiduciaries and, as such, each is prohibited from using the Plan's assets in its own interests.  Here, however, the Sequoia Fund pays compensation to DST and the Plan pays compensation to the Sequoia Fund's manager, RCG, to mirror, *i.e.*, support the Sequoia Fund's investment strategies.

42.     Even if the initial selection of RCG by the Advisory Committee was somehow prudent (putting aside *arguendo* questions of self-dealing), it bears noting that RCG has experienced significant management changes in recent years, as well as reduced its longstanding and significant reliance upon Berkshire Hathaway stock amid faltering performance, factors which the Advisory Committee apparently failed to monitor consistent with its fiduciary duties to the Plan.

43.     RCG charges the Plan a one percent (1%) "flat" fee to manage the PSA.  The 1%

flat fee paid to RCG to separately manage the PSA was and is grossly excessive.  That fee is the same fee that RCG charges retail investors in the Sequoia Fund.  Flat fees for traditional asset management mandates are exceptionally rare.  DST's $750 million institutional account easily could have negotiated a much lower fee -- with breakpoints -- than that offered to retail investors in the Sequoia Fund.  Defendants should have ensured that the asset management fee paid to Ruane was significantly less than the 1% flat fee paid by the Plan.   Indeed, RCG's Form ADV Part II indicates that, for managed accounts, the Adviser "typically" charges a 1% fee, but that "fees may be negotiable under certain circumstances or for certain managed account clients."  Here, the failure by the Advisory Committee to negotiate a lower investment management fee payable to RCG (and the Compensation Committee's apparent failure to monitor or evaluate the Advisory Committee's acts and ommisions) reflects an abject failure on the part of these fiduciaries in terms of procedural and substantive prudence and a blatant breach of fiduciary duty.  If the Advisory Committee had obtained any competent advice or engaged in any due diligence with respect to the fees being paid to RCG, or if the Compensation Committee had monitored the Advisory Committee to ensure that it was receiving competent and unbiased advice, they would have immediately discovered that the fees being paid to RCG were grossly excessive under all of the circumstances and that millions of dollars in excessive fees were being paid to RCG by the Plan.

44.     The Advisory Committee also apparently failed to police or object to RCG's dubious practice of engaging in self-dealing with respect to substantially all securities transactions.  RCG's Form ADV Part II states that the Ruane and one of its supervised persons

receive compensation in connection with the purchase and sale of substantially all securities through RCG's affiliated broker-dealer.  Even if allegedly undertaken in compliance with an applicable ERISA exemption, it was objectively unreasonable for the Advisory Committee to permit such self-dealing as a fiduciary solely focused upon the best interests of the Plan. There is absolutely no benefit to the Plan from permitting this self-dealing arrangement involving substantially all of the PSA's trading activity, which only benefits RCG and effectively results in the Plan paying RCG even more excessive and unreasonable compensation.

45.     As participants in the Plan recently and belatedly learned, RCG shockingly invested an enormous and imprudent amount of the PSA in the stock of Valeant Pharmaceuticals International, Inc. ("VRX" or "Valeant").  According to the Plan's financial statements at year-end 2014, the PSA held approximately $225 million of VRX in non-participant directed assets or almost 30% of its assets in 1,572,207 shares of Valeant with a cost of $38.2 million. According to published reports, as of June 2015, the Sequoia Fund held approximately 35% of its assets in Valeant, confirming the fact that the PSA mirrored the Sequoia Fund and acted as a clone of this mutual fund.

46.     RCG, as an investment adviser to the Plan, is an ERISA fiduciary.  RCG's investment of more than 30% percent of the PSA's assets in Valeant stock and over 15% of the Plan's assets in Valeant stock constituted a significant and shocking breach of fiduciary duty, since RCG failed to adequately diversify its investments in the PSA and otherwise breached its fiduciary duties by concentrating the PSA in one, high-risk investment.

47.     The 52-week high of Valeant stock placed the PSA's interest in VRX at an

approximate value of $414.7 million while, as of March 4, 2016, the PSA's interest in VRX had

declined to as low as $61.31 per share, representing a total value of under $97 million -- a

shocking loss in value of more than $300 million of the PSA's value from its approximate high.

The investment of such a significant portion of the PSA's portfolio value in one security was

highly imprudent and an abject breach of fiduciary duty.

48.     Making matters even worse, it is highly unlikely that RCG, as the PSA investment

manager, could sell its sizable Valeant holdings at the quoted price.  That is because the PSA and

RCG, in its role as the manager of the Sequoia Fund, is such an active participant in VRX,

holding over ten percent (10%) of Valeant stock in the Sequoia Fund alone -- not to mention

RCG's other indirect holdings of VRX through separate accounts, such as the PSA.

49.     Approximately 50% of all Plan assets are held in the PSA.  Participants who are

depending upon these assets for their retirement security have no effective choice currently

available to them, but to endure the Valeant stock, roller-coaster ride that the RCG has placed

them upon and the Advisory Committee and the other Defendants have enabled by selecting,

retaining and remaining with RCG, despite obvious and compelling reasons to replace RCG.

50.     The Advisory Committee has apparently remained with RCG as a result of a

significant failure in terms of procedural and substantive prudence, as well as due, in part, to a

longstanding, symbiotic relationship between the Company and the PSA investment manager,

RCG.  Termination of RCG, which is a battered investment manager that is mired in litigation

and has been plagued with redemptions, dismal performance and director resignations in the face

of poor investment performance and the VRX investment debacle, from its role as the Plan's

investment adviser could be disastrous to RCG but obviously is in the compelling interest of the Plan.

51.     The Advisory Committee and other Defendants, by supporting RCG in the face of the apparent breaches of fiduciary duty by RCG and its extreme departures from sound investment strategies with respect to the retirement assets contained in the PSA, as well as failing to pursue action against RCG, only can be rationally viewed as a misguided and unreasonable decision to support RCG in the face of compelling evidence that RCG has breached its fiduciary duties as an investment adviser to the Plan.  By failing to act to remove RCG and remedy its breaches of fiduciary duty, Defendants and the PSA are effectively supporting and propping up RCG at a time critical to RCG, to the benefit of RCG and the detriment of the Plan and its participants.

52.     Perversely, the PSA assets, which participants cannot redeem, are being used to support the price of the Valeant stock in the Sequoia Fund, an open-end mutual fund from which investors can redeem their shares at any time.

53.     At all pertinent times, RCG, as the investment adviser to the PSA, was responsible for prudently investing the assets of the PSA in the sole interest of the Plan participants.  RCG breached its fiduciary duties by recklessly and imprudently investing the assets of the PSA in its own interest.

54.     At all pertinent times, DST and the Advisory Committee were legally responsible for monitoring the investments undertaken by RCG in the PSA, and the Compensation Committee was legally responsible for monitoring the activities of the Advisory Committee with

-19-

respect to the PSA.  In light of the shocking breaches of fiduciary duty by RCG when investing

the PSA assets, and failing to properly diversify those investments, it is apparent that DST, the

Advisory Committee and the Compensation Committee all breached their fiduciary duties with

respect to monitoring the investment activities in the PSA and the oversight of RCG.

**D.    The Remaining/Non-PSA Portion Of The Plan And Defendants' Breaches Of Duty**

55.    In addition to the severe breaches of fiduciary duty with respect to the retirement

assets in the PSA, the remaining portion of the Plan has been severely mismanaged by

Defendants as well.  The expense ratios of many of the mutual funds included in the DST Plan

are plainly excessive in nature and result in the Plan paying tens of millions of dollars in

excessive fees to mutual funds, their investment managers and similar investment instruments

offered to participants in the non-PSA portion of the Plan.

56.    Participants in the Plan are required to pay excessive fees for the mutual funds and

other investments offered in the non-PSA portion of the Plan ("mutual funds"), which are, on

their face, unreasonable in many instances and often are multiples higher than the amounts they

should be (when compared to the expense ratios that would be associated with typical mutual

fund share classes held in retirement plan assets of the same or similar size of the DST Plan),

based upon the market and negotiating power of the Plan.

57.    Plan participants also are charged significant and excessive individual participant

fees that range from 29-35 basis points ("bps"), which result in a total cost to participants of

approximately 150 bps (*i.e.*, 1.5%), a shockingly high participant cost for investments in a

retirement plan with the assets and market power of the DST Plan.

58.     The non-PSA portion of the Plan also contains the following investment option: the BMO Prime Money Market Fund, a Plan investment that is managed by an affiliate of the Trustee of the Plan, BMO Harris Bank, N.A. ("BMO") n/k/a as OneAmerica Retirement Services LLC ("OneAmerica") -- after OneAmerica acquired BMO's U.S. retirement services business in 2015 -- investments in which qualify as party-in-interest transactions in light of the relationship between this investment option and the Plan's trustee.

59.     The $3.8 billion BMO Prime Money Market Class Y in which the Plan is invested has an extremely high expense ratio of 46 bps and has performed 1.25% over the past 10 years. In contrast, the $140 billion Vanguard Prime Money Market Fund expense ratio is 10 bps and has delivered 1.40% over the same period.  Moreover, the BMO Prime Money Market Fund Premier Class charges less than one-half the expense ratio of the BMO share class in which the Plan invests -- 21 bps -- thereby rendering the inclusion of the Class Y share class of this money market unjustifiable from the perspective of substantive and procedural prudence.  Finally, the Plan does not offer a stable value investment that could have ensured participants a minimum guaranteed investment return of at least 3% per annum.

60.     In terms of historical performance, certain of the mutual fund investments offered in the non-PSA portion of the Plan, including Fidelity Advisor Growth Opportunities, Dreyfus Intermediate Income, Lord Abbett Affiliated Fund, are poorly rated by Morningstar and should not have been maintained in the Plan by any prudent fiduciaries.  Defendants' decision to include poor performing, expensive mutual funds as investment options within the Plan is inexplicable.

61.     Defendants' failure to monitor the investments in the Plan to ensure that they

-21-

provided adequate available returns and were not excessively priced, as were the vast majority of the investments in the non-PSA portion of the Plan, including the BMO Primary Money Market Class Y, constituted breaches of fiduciary duty.  Indeed, the DST Plan is an exceptionally expensive plan in terms of total plan cost when compared to defined contribution retirement plans of a similar size.

62.     At all pertinent times, DST and the Advisory Committee were responsible for selecting and monitoring the investments, while RCG was responsible for advising DST and the Advisory Committee with respect to the investments to be offered participants in the non-PSA portion of the Plan.

63.     Ironically, client statements provided by BMO n/k/a OneAmerica specifically warn that "[i]f you invest more than 20% of your retirement savings in any one company or industry, your savings may not be properly diversified."  As discussed above, however, RCG, the sole PSA investment manager, invested approximately 30-35% of that account in a single stock (Valeant) and the PSA suffered enormous losses as a result of this lack of proper diversification.

64.     Defendants breached their fiduciary duties by imprudently failing to monitor the fees charged directly and indirectly to the Plan and its participants, and by failing to ensure that such fees were fair and reasonable under all of the circumstances.

65.     At all pertinent times, RCG, as the investment adviser to the Plan, as well as to the Advisory Committee and DST, was responsible for offering prudent and sound advice with respect to the investments to be offered to participants in the non-PSA portion of the Plan in the sole interest of the Plan participants, and to ensure that the fees and expenses charged with

respect to these investments were fair and reasonable.  RCG, DST and the Advisory Committee breached their fiduciary duties by failing to offer appropriate investments in the non-PSA portion of the Plan and by failing to ensure that the returns, performance, fees and expenses associated with these investments were fair and reasonable.

66.     At all pertinent times, DST and the Advisory Committee were legally responsible for monitoring the advice provided by RCG with respect to the non-PSA portion of the Plan, and the Compensation Committee was legally responsible for monitoring the activities of the Advisory Committee with respect to the PSA.  In light of the apparent breaches of fiduciary duty with respect to the non-PSA portion of the Plan in terms of both poor investment options and blatantly excessive fees, it is apparent that DST, the Advisory Committee and the Compensation Committee all breached their fiduciary duties with respect to monitoring the investment alternatives offered in the non-PSA portion of the Plan.

**E.     The Company Stock Fund**

67.     On October 23, 2014, the Plan was amended to eliminate DST's common stock as an investment option beginning on January 1, 2015.  Participants were advised to transfer the stock fund balance to any of the other investments available.  Any remaining investments in the stock fund were liquidated and the proceeds were automatically invested in a Vanguard Balance Fund.

68.     The Company's stock had been a solid performer (more than double S&P 500 over past five years and almost double over the past 10 years).  The Company Stock Fund may have been eliminated due to regulatory or concentration concerns.  Ironically, these same

concerns did not cause the Company to eliminate the non-participant directed PSA in 2014,
despite the obvious propensity for the PSA to become over-concentrated as demonstrated by the
Valeant stock debacle and the fact that the PSA, by its very nature, prevented participants from
appropriately diversifying their retirement investments and assets.

69.     It appears that the Company Stock Fund in which the Plan was invested until the
end of 2014 underperformed DST's stock performance itself because Defendants failed to
effectively monitor the management of the Company Stock Fund assets and, as a result, the DST
Company Stock Fund option underperformed DST's stock performance more than it should
have, presumably due to cash drag on the Company Stock Fund.

70.     As a result of Defendants' breaches of fiduciary duty by failing to effectively
monitor and manage the Company Stock Fund, participants in the Plan suffered significant
losses.

## F.     <u>Defendants' Other And Related Breaches Of Duty</u>

71.     The Advisory Committee also exercises discretion with respect to participant
investments by determining where participant contributions will be directed if a participant fails
to provide direction as to where certain assets should be invested.  The Advisory Committee,
however, has failed to advise participants where such assets are invested and how the Advisory
Committee exercises its discretion with respect to participant contributions for which an
investment direction or selection has not been provided or received.

72.     Academic and financial industry literature shows the importance of low fees in
selecting investments.  Numerous scholars have demonstrated that high expenses are not

correlated with superior investment management.  Indeed, funds with high fees on average

perform worse than less expensive funds, even on a pre-fee basis.  Virtually no investment

manager consistently beats the market over time after fees are taken into account.  If an

individual, high-cost mutual fund exhibits market-beating performance over a short period of

time, studies demonstrate that higher performance during a particular period is not predictive of

whether a mutual fund will perform well in the future.  The worst-performing mutual funds,

however, show a strong, persistent tendency to continue their poor performance.

73.     To the extent managers show any sustained ability to beat the market, the higher

performance is nearly always dwarfed by mutual fund expenses.  Accordingly, investment costs

are of paramount importance to prudent investment selection, and a prudent investor will not

select higher-cost, actively managed funds without a documented process to realistically

conclude that the fund is likely to be that extremely rare exception, if one even exists, that will

outperform its benchmark index over time, net of investment expenses.

74.     Defendants selected high-priced share classes of mutual funds, instead of identical

or available lower-cost share classes of those same mutual funds which were readily available to

the Plan.  Defendants also failed to adequately investigate and to offer non-mutual fund

alternatives, such as collective trusts and separately managed accounts, that would have been

lower priced and effectively provided the same investment options to participants.

75.     Upon information and belief, DST and the other Defendants also failed to conduct

a competitive bidding process for the Plan's recordkeeping services and investment management

services.  A competitive bidding process for the Plan's recordkeeping and investment

management services would have produced reasonable and more competitive fees for the Plan. In addition, a competitive bidding process would have enabled Defendants to select a recordkeeper and investment manager charging reasonable fees, to negotiate a reduction in fees, and to rebate any excess expenses paid by participants for recordkeeping and investment management services.

76.     Defendants failed to prudently monitor and control the recordkeeping and investment management compensation to ensure that only reasonable fees were charged for such services.

77.     Had Defendants ensured that participants were only charged reasonable fees for administrative, recordkeeping and investment management services, Plan participants would not have lost millions of dollars in their retirement savings through unreasonable fees.

78.     Defendants breached their fiduciary duties by failing to ensure that Plan participants received timely, accurate and fulsome information regarding the investments in the PSA and regarding the investment objectives of the PSA.

79.     Defendants controlled the available investment options in which the participants could invest their retirement assets, as well as the fees and expenses paid by Plan participants. Defendants failed in and breached their fiduciary duties to the Plan and its participants, based upon all of the conduct described above, including the failure to ensure that the Plan contained appropriate investments and that the Plan paid reasonable, as opposed to excessive, fees and expenses.

## V.   ERISA'S FIDUCIARY STANDARDS

80.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the

Defendants as fiduciaries of the Plan.  29 U.S.C. §1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely
> in the interest of the participants and beneficiaries and -
>
> (A)    for the exclusive purpose of
>
> (i)     providing benefits to participants and their beneficiaries;
>         and
> (ii)    defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B)    with the care, skill, prudence, and diligence under the circumstances
>        then prevailing that a prudent man acting in a like capacity and
>        familiar with such matters would use in the conduct of an enterprise
>        of like character and with like aims.

81.    Under 29 U.S.C. 1103(c)(l), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any employer and
> shall be held for the exclusive purposes of providing benefits to participants
> in the plan and their beneficiaries and defraying reasonable expenses of
> administering the plan.

82.    Under ERISA, fiduciaries that exercise any authority or control over plan assets,

including the selection of plan investments and service providers, must act prudently and solely

in the interest of participants in a plan.

83.    ERISA's fiduciary duties are "the highest known to the law" and must be done

"with an eye single" to the interests of participants.

84.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  29 U.S.C.

§1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by

another fiduciary and knowingly failing to cure any breach of duty.  ERISA states, in relevant

part, as follows:

> In addition to any liability which he may have under any other provision
> of this part, a fiduciary with respect to a plan shall be liable for a breach
> of fiduciary responsibility of another fiduciary with respect to the same
> plan in the following circumstances:
>
> > (1)  if he participates knowingly in, or knowingly undertakes
> > to conceal, an act or omission of such other fiduciary,
> > knowing such act or omission is a breach; or
> >
> > (2)  if, by his failure to comply with section 404(a)(l) in the
> > administration of his specific responsibilities which give
> > risk to his status as a fiduciary, he has enabled such other
> > fiduciary to commit a breach; or
> >
> > (3)  if he has knowledge of a breach by such other fiduciary,
> > unless he makes reasonable efforts under the circumstances
> > to remedy the breach.

85.    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to

enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.  Section 1109(a)

provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the
> responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter
> shall be personally liable to make good to such plan any losses to the plan
> resulting from each such breach, and to restore to such plan any profits of such
> fiduciary which have been made through use of assets of the plan by the fiduciary,
> and shall be subject to such other equitable or remedial relief as the court may
> deem appropriate, including removal of such fiduciary.

## VI.   <u>CLASS ACTION ALLEGATIONS</u>

86.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to

bring an action individually, on behalf of the Plan, to enforce a breaching fiduciary's liability to

the Plan under 29 U.S.C. § 1109(a).

87.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §§1132(a)(2) and (3), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan.  Plaintiff seeks to certify, and to be appointed as a representative of, the following class (the "Class"):

> All participants and beneficiaries of the DST 401(k) Plan from
> March 14, 2010 through the date of judgment, excluding the
> Defendants.

88.     This action meets the requirements of Rule 23 and should be certified as a class action for the following reasons:

a.     The Class includes more than 9,000 members and is so large that joinder of all its members is impracticable;

b.     There are questions of law and fact common to the Class because the Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant.  Thus, common questions of law and fact include the following, without limitation: to whom are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches of duty;

     c.    Plaintiff's claims are typical of the claims of the Class because Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct;

     d.    Plaintiff is an adequate representative of the Class because he was a participant in the Plan during the Class period, has no interest that is in conflict with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent attorneys to represent the Class; and

     e.    Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.

Therefore, this action should be certified as a class action under Rule 23(b)(l)(A) or (B).

89.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for

individual members to enforce their rights through individual actions, and common questions of law and fact predominate over individual questions.  Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is not aware of any difficulties likely to be encountered in the management of this matter as a class action.  As a result, alternatively, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(l)(A) or (B).

90.     Plaintiff's counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure.

## <u>COUNT I</u>
### (For Breach Of Fiduciary And Violation Of ERISA's Prohibited Transaction Rules)

91.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

92.     Defendants are fiduciaries of the Plan under ERISA, as explained above, and are fiduciaries based on the discretion, authority and/or control with respect to the administration, management and/or disposition of the Plan and its assets, and/or provision of investment advice for a fee or other compensation with respect to the monies or other property of the Plan and Defendants' authority and responsibility with respect to the administration and management of the Plan and its retirement assets.

93.     Defendants control the selection of the mutual funds available as investment options for the Plan and its participants, provide investment advice for compensation with respect to these investment options, and use their discretionary authority and responsibility in the

administration of the Plan to earn other compensation from self-dealing as described above.

94.     Defendants are prohibited from receiving benefits in connection with their positions as fiduciaries of the Plan.  At all pertinent times, Defendants have violated their fiduciary duties of prudence, loyalty and/or of monitoring under ERISA, as set forth herein.

95.     As detailed above, Defendants have engaged in and continue to engage in severe breaches of fiduciary duty with respect to the investments in the PSA and non-PSA portions of the Plan in violation of ERISA § 404, 29 U.S.C. § 1104 by failing to (a) discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of administering the plan, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, (b) to diversify the investments of the Plan so as to minimize the risk of large losses, (c) failing to monitor the performance of other fiduciaries to the Plan in a prudent and reasonable manner.

96.     As detailed above, certain of the Defendants also have engaged in and continue to engage in prohibited transactions in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by dealing with the assets of the Plan in their own interest or for their own account.

97.     As detailed above, certain of the Defendants also have engaged in and continue to engage in prohibited transactions in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), by acting on behalf of third parties which have interests that are adverse to those interests of the Plan, its participants and/or beneficiaries in connection with transactions involving the Plan.

98.     As detailed above, certain of the Defendants have engaged in and continue to engage in prohibited transactions in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), by receiving consideration for their own personal accounts from parties such as mutual funds that are dealing with the Plan in connection with transactions (*i.e.*, the purchase and sale of mutual fund shares) involving the assets of the Plan.

99.     The Advisory Committee and the Compensation Committee, respectively, have breached their fiduciary duties to the Plan by failing to adequately and prudently monitor the performance of other fiduciaries of the Plan in the performance of their duties.

100.    Pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to the Plan to credit back, disgorge and/or make restitution of all improper compensation received by them and are liable to the Plan and the Class to pay damages or make restitution to the Plan with respect to the losses suffered by the Plan.

101.    Plaintiff and the Class also are entitled to all equitable or remedial relief as the Court may deem appropriate and just.

102.    Pursuant to ERISA § 502, 29 U.S.C. § 1132, Plaintiff and the Class seek an Order declaring that the above-described practices of Defendants violate ERISA, as set forth above, and seek a permanent injunction preventing Defendants from engaging in such conduct in the future.

## COUNT II
### (For Breach Of Fiduciary Duty)

103.    Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

104.    Defendants' conduct, as set forth above, violates their fiduciary duties under

ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A),(B) and (C), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to diversify the investments of the Plan so as to minimize the risk of large losses.  In addition, as set forth above, the Advisory Committee and the Compensation Committee violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

105.    As a direct result of Defendants' breaches of duties, Plaintiff and the Class have suffered losses and damages.

106.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT III
### (For Co-Fiduciary Breach And Liability For Knowing Breach Of Trust)

107.    Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

108.    In the alternative, to the extent that any of the Defendants is not deemed a

fiduciary or co-fiduciary under ERISA, each such Defendant is liable to Plaintiff and the Class for all recoverable damages and relief as a non-fiduciary that knowingly participated in a breach of trust.

WHEREFORE, Plaintiff, on behalf of himself and the Class, demands judgment against Defendants, for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)     Disgorgement, restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which Plaintiff and the Class may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby demands trial by jury as to all claims so triable.

**NOTICE PURSUANT TO ERISA § 502(h)**

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated: March 14, 2016   Respectfully submitted,

         SHEPHERD, FINKELMAN, MILLER
          & SHAH, LLP

         /s/ Laurie Rubinow (LR 6637)
         James E. Miller
         Laurie Rubinow
         65 Main Street
         Chester, CT 06412
         Telephone: (860) 526-1100
         Facsimile:  (866) 300-7367
         Email: jmiller@sfmslaw.com
             lrubinow@sfmslaw.com

         Ronald S. Kravitz
         Kolin C. Tang
         SHEPHERD, FINKELMAN, MILLER
          & SHAH, LLP
         One California Street, Suite 900
         San Francisco, CA 94111
         Telephone: (415) 429-5272
         Facsimile:  (866) 300-7367
         Email: rkravitz@sfmslaw.com
             ktang@sfmslaw.com

Rose F. Luzon
Chiharu G. Sekino
SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
401 West A Street, Suite 2550
San Diego, CA 92101
Telephone: 619-235-2416
Facsimile:  (866) 300-7367
Email: rluzon@sfmslaw.com
          csekino@sfmslaw.com

***Attorneys for Plaintiff
and the Proposed Class***