UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------

| | |
|---|---|
| CLIVE COOPER, *individually and as a representative of a class of similarly situated plan participants, on behalf of the* DST SYSTEMS, INC. 401(K) PROFIT SHARING PLAN, | 16cv1900 |
| | OPINION & ORDER |
| Plaintiff, | |
| -against- | |
| RUANE CUNNIFF & GOLDFARB INC., | |
| Defendant. | |

------------------------------------------------------------

WILLIAM H. PAULEY III, United States District Judge:

Ruane Cunniff & Goldfarb Inc. ("Ruane") moves to compel Clive Cooper ("Cooper") to arbitrate his claims, or in the alternative, dismiss Count Three of the Complaint. For the reasons that follow, Ruane's motion to compel arbitration is granted.

BACKGROUND

This ERISA action arises from the alleged mismanagement of assets in the DST Systems, Inc. 401(k) Profit Sharing Plan (the "Plan"). Cooper, individually and as representative of similarly situated Plan participants, brings claims on behalf of the Plan, alleging principally that the Plan's fiduciaries pursued an imprudent investment strategy that resulted in losses exceeding $100 million. (Complaint ("Compl."), ECF No. 1, ¶ 5.) Cooper further alleges that Plan fiduciaries deprived participants of timely and meaningful information regarding their investments, including investment objectives, strategies, portfolio holdings, and the risk levels associated with each investment. (Compl., ¶¶ 31–33.) Moreover, Cooper claims that conflicts of interest between Ruane—the Plan's investment manager—and DST hobbled management of the

Plan, and allowed Ruane to enter into self-dealing transactions, charge unreasonable fees, and continue as investment manager despite years of dismal performance. (See Compl., ¶¶ 43–52.)

I. The DST Plan

In 1999, Cooper began working at DST as a software development manager. His career there spanned more than 16 years until his retirement in January 2016. (Def. Motion to Compel Arbitration ("Def. Mot."), Ex. SS, ECF No. 65–45, Cooper Tr. 27:6–15.) As part of his employment, Cooper joined the Plan. (Cooper Tr. 30:16–18.) The Plan consisted of two components: (1) a participant-directed 401(k) plan in which employee contributions were matched by DST up to a certain percentage; and (2) a profit sharing account (the "PSA") in which DST made 100% of the contributions on behalf of its employees based on a percentage of their eligible wages each year. (Compl., ¶ 27; Cooper Tr. 34:2–15, 36:8–13; Def. Mot., Ex. TT, ECF No. 65–46, Young Tr. 137:6–9, 137:10–14.)

Notably, participants could not opt out of the PSA—they were automatically enrolled by virtue of their employment. (Cooper Tr. 34:17–20; Young Tr. 137:24–138:1.) Moreover, participants could not transfer assets out of the PSA unless they ended their employment with DST. (Def. Mot., Ex. B, ECF No. 65–2, Summary Plan Description of the DST Plan Effective January 1, 2000 ("2000 DST SPD"), at 12–13.) Ruane, as the investment manager selected by DST's Advisory Committee, managed all PSA assets. (2000 DST SPD at 10.)

II. DST and Cooper's Relationship with Ruane

Ruane had a longstanding, symbiotic relationship with DST that " '[went] back decades-to the 1980s.'" (Compl., ¶¶ 35, 50.) As early as 1973, DST's Advisory Committee retained Ruane as the exclusive manager of PSA assets. (See, e.g., Def. Mot., Ex. E, ECF No.

2

65–5, 2011 Profit Sharing Contribution Notice to DST Plan Participants ("Profit Sharing Contribution Notice"); Young Tr. 213:14–19; Cooper Tr. 128:4–6.) The Advisory Committee, a fiduciary under ERISA, was responsible for monitoring Ruane's performance. (Young Tr. 199:9–12.) Separately, DST's Compensation Committee, also a fiduciary of the Plan, supervised the Advisory Committee. (Young Tr. 199:9–12; Compl., ¶ 14.) As part of its oversight duties, the Advisory Committee reviewed periodic reports provided by Ruane. (Young Tr. 198:12–18.) Several times a year, Ruane discussed investment strategies and individual stocks in the PSA with the Advisory Committee. (Young Tr. 203:3–8.) DST retained authority over Ruane—it could, at any time, modify the investment guidelines to which Ruane was subject or terminate Ruane by written notice. (Compl., ¶ 22; Def. Mot., Ex. KK, ECF No. 65–37, Investment Management Agreement dated February 12, 1998, at 2.)

Cooper's relationship with Ruane stems largely from notices and communications he received as a Plan participant over the course of his employment. Those documents identified Ruane as the exclusive manager of PSA assets. Various iterations of the Summary Plan Descriptions explain that all "Profit Sharing Contributions made by [DST] to the Plan on [Cooper's] behalf will be invested by the Trustee as advised by Ruane . . . the investment advisor selected by the [DST] Advisory Committee to manage these funds." (Def. Mot., Ex. I, 2008 DST SPD, at 10; Exs. J–L, 2011–13 DST SPD, at 11.) Cooper received annual notices about DST's contributions on behalf of Plan participants, which reported Ruane's latest performance. (Def. Mot., Exs. E–H, 2011–14 Sharing Contribution Notices.) Account statements updated Cooper on individual stocks selected by Ruane and disclosed the investment management fee that Ruane received every quarter for managing Cooper's account. (See Def. Mot. Ex. M, Account Statement dated Jan. 1, 2013–Sept. 30, 2013, at 1; Ex. N, Account Statement dated Jan.

1, 2015–Dec. 31, 2015, at 4 ("Ruane is actively monitoring the performance of Valeant stock and will continue to act to ensure that the [PSA] funds are invested in a prudent manner.").) As a participant in the Plan, Cooper appears to have taken an active interest in monitoring the PSA, taking notes on his statements about the performance of its assets and analyzing them to determine how much DST contributed on his behalf every year. (Cooper Tr. 76:14–77:22, 77:17–25.)

In 2012, Ruane came into sharper focus when DST advised employees that it would no longer pay Ruane's management fees for them. (Def. Mot., Ex. JJ, DST Plan Important Notice of Investment Management Fee Change dated Dec. 3, 2012.) Effective January 1, 2013, Plan participants, including Cooper, began paying their pro rata share of Ruane's fees, which were deducted from each employee's PSA. (Cooper Tr. at 87:11-23, Young Tr. at 180:4.)

III.   DST's Arbitration Program and Agreement

As a DST employee, Cooper received a copy of the "Associate Handbook," a manual memorializing a number of employment-related policies, benefits, standards of conduct, and programs. (Def. Mot., Ex. C, Associate Handbook, at 1.) The Associate Handbook contained a section on arbitration which stated, in relevant part:

> For employment-related legal disputes that are not resolved through our Open Door Policy or Equal Employment Opportunity (EEO) Policy, the Company has implemented an arbitration program under the DST Output Arbitration Program and Agreement that is set forth in the Addendum to this Handbook.

(Associate Handbook at 5.) The Arbitration Program and Agreement (the "Arbitration Agreement") covered "all legal claims arising out of or relating to employment, application for employment, or termination of employment, except for claims specifically excluded under the terms" of the agreement. (Associate Handbook at A–4.) Four discrete categories of claims were

4

carved out from arbitration: (1) workers' compensation benefits, (2) unemployment compensation benefits, (3) ERISA-related benefits provided under a Company sponsored benefit plan, and (4) claims filed with the National Labor Relations Board. (Associate Handbook at A– 4.) While DST strongly encouraged employees to resolve employment disputes through arbitration, it allowed them to opt out of the arbitration program within 30 days of receipt of the Arbitration Agreement. (Associate Handbook at A–5.)

On August 11, 2008, Cooper signed the Acknowledgement and Agreement Form, indicating that he understood and agreed that if he did not "opt out in writing within 30 days after [he] receive[d] the [Arbitration Agreement], then [he] and [DST] shall be considered to have agreed" to the arbitration program "as a binding contract to waive the right to judge or jury trial and to resolve employment-related legal claims under the terms" of the Arbitration Agreement. (Def. Mot., Ex. D, Acknowledgment and Agreement Form DST Output Arbitration Program and Agreement with Associate Opt Out Right; see also Cooper Tr. 134:17–23.) Cooper did not opt out of the Arbitration Agreement. (Cooper Tr. 134:20–23.)

IV. The ERISA Action

In March 2016, Cooper filed this lawsuit. Several months later, he voluntarily dismissed his claims against all Defendants in this action except Ruane. (See Notice of Partial Dismissal Pursuant to Fed. R. Civ. P. 41(a)(1)(A), ECF No. 41.) Cooper chose to mediate his claims with the DST Defendants in a private forum. (Plaintiff's Opposition to Motion to Compel Arbitration ("Pl. Opp."), ECF No. 70, at 29.) While Cooper dismissed DST, he did not amend his Complaint.

5

DISCUSSION

I. Standard

"In the context of motions to compel arbitration brought under the Federal Arbitration Act . . . the court applies a standard similar to that applicable for a motion for summary judgment." Bensadoun v. Jobe–Riat, 316 F.3d 171, 175 (2d Cir. 2003) (internal citations omitted). "A motion to compel arbitration must be dismissed and a trial held if there is an issue of fact as to the making of the agreement for arbitration." Brown v. St. Paul Travelers Co., Inc., 331 Fed. App'x 68, 69 (2d Cir. 2009). In making that determination, this Court must consider the pleadings, discovery materials, and affidavits showing whether there is a genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ryan v. JPMorgan Chase & Co., 2013 WL 646388, at *2 (S.D.N.Y. Feb. 21, 2013).

II. Analysis

A. Claims "Arise Out of" and "Relate To" Employment

The central issue raised in Ruane's motion is whether Cooper's breach of fiduciary duty claims relating to the mismanagement of assets in the Plan fall within the ambit of DST's broadly worded Arbitration Agreement covering all claims "arising out of or relating to" his employment at DST. Ruane contends that Cooper should be compelled to arbitrate those claims because "Cooper is a participant in the DST Plan only by virtue of his employment by DST, and his claims are entirely about the management and operation of the DST Plan." (Def. Mot. at 21.)

Cooper counters that because he is bringing suit on behalf of the Plan, and not himself, his ERISA claims arise under the operative Investment Management Agreement between DST and Ruane, which does not have an arbitration clause. (Plaintiffs' Opposition to

6

Motion to Compel Arbitration ("Pl. Opp."), at 11–12.) Moreover, Cooper contends that the Arbitration Agreement has no application to his claims here because Ruane was never a party to it. Rather, Cooper emphasizes that the Summary Plan Descriptions explicitly state that if "Plan fiduciaries misuse the Plan's money . . . [he] may file suit in a federal court." (Pl. Opp. at 12–13 (citing Ex. 10, 2000 DST SPD, ECF No. 70–12, at 21–22).) In any event, even if the Arbitration Agreement were to apply, Cooper argues that claims for ERISA-related benefits are specifically carved out. (Pl. Opp. at 16–17.)

As an initial matter, ERISA claims may be arbitrated subject to the parties' agreement. "Congress has not evinced an intention to preclude a waiver of judicial remedies for ERISA claims." Murphy v. Canadian Imperial Bank of Commerce, 709 F. Supp. 2d 242, 247 (2d Cir. 2010) (citing Bird v. Shearson Lehman/Am. Express, Inc., 926 F.2d 116, 118–22 (2d Cir. 1991)). Moreover, claims arising under ERISA necessarily relate to a party's employment. ERISA is a comprehensive statute that regulates employee retirement plans. See generally 29 U.S.C. § 1001 et seq. The statute was enacted by Congress to ensure that "if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 375 (1980). In other words, it is designed to protect the compensation and benefits that a worker derives directly from an employment relationship.

Against this backdrop, Cooper's ERISA claims arise out of, or relate to, his employment at DST. The Arbitration Agreement was broadly drafted to encompass a wide variety of claims relating to Cooper's employment. (Young Tr. 245:22–246:4 ("company's intention" was to create an arbitration program covering "a broad range of claims that could arise out of any relationship that employees have with the company . . . first and foremost with respect

7

to scope was on the breadth of claims.").) While the Arbitration Agreement does not expressly identify ERISA breach of fiduciary duty claims, it does specify that "other statutory' claims pertaining to employment fall within its coverage. (Associate Handbook at A–4.)

The funds that Cooper claims Ruane mismanaged specifically originate from his employment with DST. Contributions to the Plan, both with regard to the 401(k) and PSA portions, constitute Cooper's compensation. DST matched "dollar-for-dollar [ ] [his] 401(k) Contributions, up to 3% of [his] Compensation for each payroll period," and also made a "'Profit Sharing Contribution'" irrespective of his 401(k) contributions. (2000 DST SPD at 7–8.) At his deposition, Cooper acknowledged that he considered DST's contributions to be a part of his compensation. (Cooper Tr. 62:10–15.)

The very purpose of the Plan was "to encourage [employees] to stay with [DST] until retirement." (2000 DST SPD at 12.) The PSA, in particular, like other profit sharing plans, appropriately incentivizes employees by tying their job performance and compensation with the success of the company. Caplin v. United States, 718 F.2d 544, 548 (2d Cir. 1983) (profit sharing plans "designed to provide an employee with deferred compensation, the amount of which depends upon the success of the business and the employee's position in that business"). Consistent with the Plan's purpose, any unvested funds in the PSA at the time an employee "terminate[d] [his or her] employment for any reason other than death, disability or retirement" were forfeited. (2000 DST SPD at 12.)

Apart from the nature of the contributions and purpose of the Plan, Cooper's specific causes of action relate to his employment. At their core, the claims concern how poorly DST and Ruane managed the assets which Cooper considered to be his compensation. Those breach of fiduciary duty claims arise exclusively under ERISA §§ 409 and 502, 29 U.S.C. §§

8

1109 and 1132. (Compl., ¶¶ 95, 104.) Cooper resists this assertion, maintaining that the claims arise from the "investment agreement between DST on behalf of the Plan and Ruane." (Pl. Opp. at 1 (emphasis removed).) But the Investment Management Agreement only memorializes Ruane's scope of work, authority, and advisory relationship with DST. (See Def. Mot., Exs. KK–LL, Investment Management Agreement dated Feb. 1998 and 2010, ECF Nos. 65–37, 38.) It is akin to an engagement letter.

The claims here concern a breach of fiduciary duty specifically recognized under ERISA, not a breach of the Investment Management Agreement. See In re Lehman Bros. Sec. and ERISA Litig., 2012 WL 6013012, at *1 (S.D.N.Y. Dec. 3, 2012) (recognizing that "the Second and Third Circuits permit[ ] plan beneficiaries to assert claims derivatively on behalf of their plans, [as] claims all [ ] based on express provisions of ERISA."); see also Mertens v. Hewitt Assocs., 508 U.S. 248, 255–58 (remedies under Section 502 of ERISA intended to be exclusive). The Investment Management Agreement simply provides the necessary context for the formal relationship between Ruane and DST, and clarifies the scope of Ruane's duties and obligations vis-à-vis DST. But Ruane's fiduciary status, and the duties inherent to that position, do not spring from the Investment Management Agreement. Ruane is a fiduciary by virtue of the authority it exercises over Plan assets. Based on that authority, ERISA designates the investment manager of an employee benefits plan as a fiduciary. See 29 U.S.C. § 1002(38); Coulter v. Morgan Stanley & Co. Inc., 753 F.3d 361, 366 (2d Cir. 2014) (fiduciary status is determined under ERISA regardless of what other documents or agreements state).

Moreover, the Summary Plan Descriptions do not undermine the notion that Cooper's claims are employment disputes subject to arbitration. While the Summary Plan Descriptions advise Plan participants that they "may file suit in a federal court" for claims

9

relating to a fiduciary's misuse of Plan assets, that option is not the exclusive avenue for relief. Cooper's reliance on the language of the Summary Plan Descriptions overlooks the possibility that other documents could supersede the option to sue in federal court. Summary Plan Descriptions have no contractual force—they are "summary documents" that "provide communication with beneficiaries <u>about</u> the plan, but . . . do not themselves constitute the <u>terms</u> of the plan." <u>CIGNA Corp. v. Amara</u>, 563 U.S. 421, 438 (2011) (emphasis original); <u>Durham v. Prudential Ins. Co. of Am.</u>, 890 F. Supp. 2d 390, 395 (S.D.N.Y. 2012) (summary plan descriptions "may not be enforced as if they are the terms of the plan itself"). Thus, these documents cannot "cancel or supersede a prior obligation to arbitrate." <u>Chaitman v. Wolf Halderstein Adler Freeman & Herz LLP</u>, 2004 WL 2471372, at *4 (S.D.N.Y. Nov. 3, 2004).

Finally, Cooper cites the ERISA-related exception in the Arbitration Agreement as an additional basis to circumvent his obligation to arbitrate. But that exception applies only to claims for benefits "in accordance with a plan's reasonable procedure for filing benefit claims." 29 C.F.R. 2560.503-1(e); 29 U.S.C. § 1133. ERISA benefit claims seek "to recover benefits due to [employees] under the terms of [their] plan, enforce [their] rights under the terms of the plan, or to clarify [their] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). For example, the DST Summary Plan Description specifically contemplates a situation in which an employee, who temporarily leaves DST's employ but returns within a certain period of time, files a claim for benefits to recover contributions he believes were incorrectly forfeited. (2000 DST SPD at 12.) In such a case, the employee must first exhaust the Claims Procedure established by the company before filing suit. (2000 DST SPD at 18 ("[N]o judicial or arbitration proceedings with respect to any claim for Plan benefits hereunder may be

10

commenced by any participant . . . until the procedures set forth in the Plan have been exhausted in full.").)

Cooper does not allege that any of the Defendants denied him benefits under the Plan, nor does he seek clarification or enforcement of those benefits. Rather, his claims are premised on the mismanagement of funds contributed on his behalf under the Plan. Cooper's grievance here is not so much that he did not receive those contributions as it is that their value was diminished as a result of Ruane's mismanagement. There is a clear difference between the narrow category of ERISA-related benefit claims exempted from arbitration and Cooper's breach of fiduciary duty claims here. See Park v. Trustees of 1199 SEIU Health Care Emps. Pension Fund, 418 F. Supp. 2d 343, 357 (S.D.N.Y. 2005) (distinction between the two types of claims "would be rendered meaningless if claimants could evade [the administrative procedure applicable to ERISA-related benefit claims] simply by characterizing claims for benefits as claims for breach of fiduciary duty.").

In sum, Cooper's claims regarding these funds "clearly relate[ ] to his employment . . . by [DST], and fall[ ] squarely within the scope of the [a]rbitration [p]rovision." Canadian Imperial Bank, 709 F. Supp. 2d at 246; Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 846 (2d Cir. 1987) ("If the allegations under the claims 'touch matters' covered by [the arbitration agreement], then those claims must be arbitrated, whatever the legal labels attached to them.").

B. Equitable Estoppel

Having found that the underlying claims are subject to arbitration, this Court must next determine whether Ruane, a non-signatory to the Arbitration Agreement, may compel Cooper to arbitrate his claims under the doctrine of equitable estoppel.

Generally, "[a]rbitration is a matter of contract, and therefore a party cannot be required to submit to arbitration any dispute which it has not agreed so to submit." Fensterstock v. Educ. Finance Partners, 2012 WL 3930647, at *4 (S.D.N.Y. Aug. 30, 2012) (citing JLM Indus., Inc. v. Stolt–Nielsen SA, 387 F.3d 163, 171 (2d Cir. 2004)). But where parties "have contractually agreed to arbitrate, they may be required to submit to arbitration even against a non-signatory." Fensterstock, 2012 WL 3930647, at *4. Under the doctrine of equitable estoppel, "a non-signatory can compel arbitration where (i) there is a close relationship between the parties and controversies involved and (ii) the signatory's claims against the non-signatory are intimately founded in and intertwined with the underlying agreement containing the arbitration clause." Fensterstock, 2012 WL 3930647, at *4 (internal quotation marks omitted). "The standard that governs such situations looks to the degree to which the issues sought to be arbitrated are intertwined with the agreement that the estopped party has signed, not to evidence that the estopped party actually intended or expected that any dispute with the nonsignatory would be subject to arbitration." Carroll v. LeBoeuf, Lamb, Greene & MacRae, L.L.P., 374 F. Supp. 2d 375, 378 (S.D.N.Y. 2005) (internal quotation marks omitted).

      i. <u>Relationships Between the Parties and Controversy Involved</u>

Under the first requirement, the non-signatory party must have a sufficiently close relationship with the signatory parties. "The Second Circuit has held that an agent of a signatory to a contract is one of the parties entitled to invoke the arbitration provision." Fensterstock, 2012 WL 3930647, at * 4 (citing Ross v. Am. Express Co., 547 F.3d 137, 144 (2d Cir. 2008)). At all relevant periods, Ruane was DST's agent appointed as the Plan's investment manager and subject to removal by the Advisory Committee with or without cause at any time. (See Def. Mot., Ex. A, DST 401(k) Profit Sharing Plan Effective January 1, 2008, at §§ 4.2 (f), (g).)

Absent an agency relationship, the non-signatory must be associated with the signatory in some way. In Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 127 (2d Cir. 2010), for example, the plaintiff, employed by the signatory, "understood [the non-signatory] to be, to a considerable extent, her co-employer," and therefore was required to arbitrate with the non-signatory. The "existence of a relationship" between a signatory and non-signatory allows "the latter to avail itself of the arbitration agreement." Ragone, 595 F.3d at 128. Put another way, over time and through regular communications, Cooper reasonably would have known that Ruane "was, or would predictably become, with [Cooper's] knowledge and consent, affiliated or associated with [DST] in such a manner as to make it unfair to allow [Cooper] to avoid [his] commitment to arbitrate on the ground that [Ruane] was not the very entity with which [Cooper] had a contract." Ross, 547 F.3d at 149–50.

DST and Ruane have enjoyed a longstanding relationship that predates Cooper's employment. Their relationship is not only memorialized in the Investment Management Agreement, but apparent from their regular meetings to discuss investment objectives, strategies, and decisions with respect to the PSA. (Def. Mot., Ex. UU, Poppe Tr. 27:24–28:4, 31:22–32:3, 32:13–14; Young Tr. 198:12–18, 199:9–12, 203:3–8.) Through this relationship, both DST and Ruane occupied co-extensive positions as Plan fiduciaries. It is this close relationship that Cooper claims was riddled with conflicts of interest between DST and Ruane and forms the basis of his allegations that the Advisory Committee allowed Ruane to charge unreasonable expenses and fees, exercised inadequate oversight over Ruane's self-dealing transactions, and "support[ed] and propp[ed] up [Ruane] at a time critical to [Ruane], to the benefit of [Ruane] and the detriment of the Plan and its participants." (Compl., ¶¶ 43–44, 51.)

The facts obtained through limited discovery also shed light on Cooper's relationship with Ruane. As a Plan participant, Cooper received a stream of information about Ruane's role as the sole investment manager—through Plan documents, account statements, and investment fee notices—over a sixteen year period. (See, e.g., 2008, 2011–13 DST SPDs; 2011–14 Profit Sharing Contribution Notices; DST Plan Account Statements; DST Plan Important Notice of Investment Management Fee Change dated Dec. 3, 2012.)

Though the extent of Cooper's relationship with Ruane is limited to those communications, Ruane was no stranger to Cooper. Cooper knew that Ruane was actively involved in investing and managing the PSA assets—at one point directly paying Ruane for those services—and was aware that Ruane counseled the Advisory Committee on non-PSA investments offered to Plan participants. The relationships among the parties here were "of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." Sokol Holdings, Inc. v. BMB Munai, Inc., 542 F.3d 354, 359 (2d Cir. 2008).

Finally, there is substantial overlap between Cooper's claims against DST and Ruane. The Complaint indiscriminately lumps DST and Ruane together as "Defendants." (See, e.g., Compl., ¶¶ 1, 5–6.) "Where a plaintiff treats all defendants as a single unit in his complaint, it further supports estopping that plaintiff from shielding himself from arbitrating with certain defendants." Victorio v. Samm's Fishbox Realty Co., LLC, 2015 WL 2152703, at *17 (S.D.N.Y. May 6, 2015). More tellingly, the claims against DST and Ruane, as co-fiduciaries, are mutually dependent. DST's alleged failure to monitor the Plan investments managed by Ruane, and its failure to resolve any conflicts of interest underlying its relationship with Ruane,

form a large part of Cooper's claims. While DST and Ruane may each have served different roles with respect to the Plan assets, the primary issue is the same: whether their actions breached their fiduciary duty to the Plan. Cartagena Enter., Inc. v. J. Walter Thompson Co., 2013 WL 5664992, at *4–5 (S.D.N.Y. Oct. 16, 2013) ("The issue is the same: whether or not Defendants breached the terms of the License Agreement and infringed [plaintiff's] copyright by distributing and posting the videos."). Given the substantial overlap, Cooper "may not evade [his] obligation to arbitrate by naming [Ruane]" as the sole party in this action. Danisco A/S v. Novo Nordisk A/S, 2003 WL 282391, at *4 (S.D.N.Y. Feb. 10, 2003).[1]

        ii. Intertwinedness of Claims and Subject Matter of the Arbitration Agreement

The second step under the estoppel analysis mandates finding that the "issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." Choctaw Generation Ltd. Partnership v. Am. Home Assur. Co., 271 F.3d 403, 406 (2d Cir. 2001). Cooper seizes on this language in arguing that his claims are not intertwined with the Arbitration Agreement because it "does not contemplate arbitration of breach of fiduciary duty claims against a third party such as" Ruane. (Pl. Opp. at 21.) Put another way, because Cooper does not depend on "the underlying contract in making out the claim against the non-signatory defendant"—which is "always the sine qua non for applying

---

[1] Ruane harps on Cooper's decision to drop his claims against DST as a "tactical dismissal" designed to avoid the arbitration issue altogether. While that development is not dispositive of the issues presented in this motion, it is nonetheless relevant to the analysis concerning the similarity of disputes among Cooper, DST, and Ruane. Cooper claims that he stipulated to dismissal so that he could "focus his efforts and resources on the defendant that is primarily responsible for the misconduct at issue." (Pl. Opp. at 29.) But had DST remained in this action, it would have invoked the Arbitration Agreement as a signatory, which would then have created the awkward possibility that DST could arbitrate but Ruane could not. The potential for such an odd result, however, only underscores the notion that the claims against DST and Ruane are so similar—and the roles of DST and Ruane so critical—that Ruane should be allowed to avail itself of the Arbitration Agreement and "justif[y] sending this entire dispute to arbitration." Ragone, 595 F.3d at 128.

equitable estoppel"—he claims that Ruane cannot satisfy the second step. (Pl. Opp. at 19 (citing Denney v. Jenkens & Gilchrist, 412 F. Supp. 2d 293, 298 (S.D.N.Y. 2005))).).

If that were the case, however, equitable estoppel would never apply to situations where the basis for arbitrating a claim arises from a stand-alone arbitration agreement. Thus, courts in the Second Circuit have recognized that the "intertwinedness" requirement is satisfied when a "signatory's claims arise under the 'subject matter' of the underlying agreement." Chase Mortg. Company-West v. Bankers Trust Co., 2001 WL 547224, at *2 (S.D.N.Y. May 23, 2001); Ragone v. Atl. Video at Manhattan Ctr., 2008 WL 4058480, at *8 (S.D.N.Y. Aug. 29, 2008); Lismore v. Societe Generale Energy Corp., 2012 WL 3577833, at *7 (S.D.N.Y. Aug. 17, 2012) (focus is on whether the claims "arise from the subject matter of the agreement with the arbitration clause.").

Similar to the case at bar, the plaintiff in Barreto v. JEC II, LLC, 2017 WL 3172827 (S.D.N.Y. July 25, 2017), entered into a stand-alone arbitration agreement codified in an employee handbook. When the plaintiff filed a Title VII civil rights suit against a group of signatory defendants and non-signatory defendants, the Barreto court compelled the plaintiff to arbitrate his claims against all defendants on the basis that the claims were "intertwined with the arbitration agreement, which provides that all claims 'arising out of' plaintiffs' employment with [the signatory defendants] are subject to arbitration." Barreto, 2017 WL 3172827, at *6. The same is true here. The Arbitration Agreement broadly encompasses claims arising out of or relating to Cooper's employment, including statutory claims. Cooper's breach of fiduciary duty claims stem from the ERISA statute and, while not tethered to any specific agreement, relate to the subject matter of the Arbitration Agreement.

### C. National Labor Relations Act and Norris-LaGuardia Act

Cooper further argues that even if the Arbitration Agreement "could be stretched to apply to [Ruane], [it] violates the National Labor Relations Act ("NLRA") and the Norris-LaGuardia Act by prohibiting collective action by employees," including participation in class, collective, or any other representative actions. (Pl. Opp. at 31.) According to Cooper, because employees must enter into the Arbitration Agreement as a condition of employment, the agreement is unenforceable. (Pl. Opp. at 32.)

Cooper's argument fails in two respects. First, the majority of courts have enforced collective action waivers in arbitration agreements. Am. Express Co. v. Italian Colors Rest., 133 S. Ct. 2304, 2311 (2013); Sutherland v. Ernst & Young LLP, 726 F.3d 290, 296–97 (2d Cir. 2013); Diaz v. Mich. Logistics Inc., 167 F. Supp. 3d 375, 382 (E.D.N.Y. 2016) (National Labor Relations Board decisions regarding unenforceability of class action waivers "has been overwhelmingly rejected by courts throughout the country, including those in the Second Circuit."); Torres v. United Healthcare Servs., Inc., 920 F. Supp. 2d 368, 378 (E.D.N.Y. 2013) (noting that "an arbitration agreement with a collective action waiver falls outside the limitations of [the NLRB's rulings] when the agreement does not preclude an employee from filing a complaint with an administrative agency."). Second, signing the Arbitration Agreement here was not a condition of employment at DST. Rather, "participation in the [Arbitration Program and Agreement] [was] entirely voluntary because all [employees] ha[d] the right to opt out of the program within 30 days after receiving" the Arbitration Agreement." (Associate Handbook at 5.) Cooper understood that he could opt-out of the arbitration program and voluntarily chose not to. (Def. Mot., Ex. D, Acknowledgement and Agreement Form dated August 11, 2008.)

## CONCLUSION

For the foregoing reasons, Ruane's motion to compel arbitration is granted. The Clerk of Court is directed to terminate the motion pending at ECF No. 63 and mark this case as closed.

Dated: August 15, 2017
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.